## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE AMERICAN INTERNATIONAL GROUP, INC. 2007 DERIVATIVE LITIGATION | ) Lead Case No. 07-CV-10464 (LAP) <br> ) <br> ) (Derivative Action) <br> ) |
| This Document Relates To: <br><br> ALL ACTIONS. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## OPPOSITION TO MOTION TO DISMISS BY NOMINAL DEFENDANT AMERICAN INTERNATIONAL GROUP, INC.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................ ii

I.      INTRODUCTION .............................................................................................. 1

II.     STATEMENT OF FACTS ................................................................................. 3

        A.      Background ............................................................................................. 3

        B.      A Subprime Mortgage Crisis Emerges ................................................. 3

        C.      The Stock Repurchase Program ............................................................. 4

        D.      Defendants Announce Massive Portfolio Losses and Internal Control
                Deficiencies ............................................................................................ 5

III.    APPLICABLE LEGAL STANDARDS FOR DEMAND FUTILITY ............... 5

IV.     DEMAND ON THE AIG BOARD WOULD HAVE BEEN FUTILE .............. 6

        A.      The Board's Decision to Approve the Stock Repurchase Was Not a Valid
                Exercise of Valid Business Judgment .................................................... 6

        B.      Demand on Defendants Miles, Offit and Sutton, as Members of the Audit
                Committee, Would Have Been Futile Because They Face a Sufficiently
                Substantial Likelihood of Liability ........................................................ 9

                1.      Defendants Miles, Offit and Sutton's Duties as Members of the
                        Audit Committee ......................................................................... 10

                2.      Defendants Miles, Offit and Sutton Face a Sufficiently Substantial
                        Likelihood of Liability for Breaching Their Fiduciary Duties ....... 10

        C.      Defendants Concede that Demand on Sullivan, Tse and Cohen Would
                Have Been Futile .................................................................................. 12

        D.      The Totality of the Circumstances Demonstrate the Futility of Demand ....... 13

V.      CONCLUSION ................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aronson v. Lewis*,
473 A.2d 805 (Del. 1984) ........................................................................... 6, 8

*Brehm v. Eisner*,
746 A.2d 244 (Del. 2000) ............................................................................. 6

*Brophy v. Cities Serv. Co.*,
70 A.2d 5 (Del. Ch. 1949)............................................................................ 13

*Felker v. Anderson*,
No. 04-0372, 2005 WL 602974 (W.D. Mo. Feb. 11, 2005) ........................... 11

*Guttman v. Huang*,
823 A.2d 492 (Del.Ch. 2003)....................................................................... 13

*In re Cendant Corp. Derivative Action Litig.*,
189 F.R.D. 117 (D.N.J. 1999) ............................................................... 6, 9, 14

*In re Cooper Co., Inc.*,
No. 12584, 2000 WL 1664167 (Del. Ch. Oct. 31, 2000).............................. 12

*In re Countrywide Fin. Corp. Derivative Litig.*,
Lead Case No. CV-07-06923-MRP (MANx), 2008 WL 2064977 (C.D. Cal.
May 14, 2008)...................................................................................... 7, 8, 9

*In re First Capital Holdings Corp.*,
146 B.R. 7 (Bankr. C.D. Cal. 1992)............................................................. 11

*In re First Merchs. Acceptance Corp. Sec. Litig.*,
No. 97 C 2715, 1998 WL 781118 (N.D. Ill. Nov. 4, 1998)............................ 11

*In re Lernout & Hauspie Sec. Litig.*,
286 B.R. 33 (Bankr. D. Mass. 2002) ........................................................... 10

*In re Livent, Inc. Sec. Litig.*,
78 F. Supp. 2d 194 (S.D.N.Y. 1999).............................................................. 10

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) ........................................................... 11

*In re Mut. Funds Inv. Litig.*,
384 F. Supp. 2d 873 (D. Md. 2005) .............................................................. 11

*In re NVF Co. Litig.*,
Civ. A. No. 9050, 1989 WL 146237 (Del. Ch. 1989)..................................... 7

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    192 F.R.D. 111 (S.D.N.Y. 2000) .................................................................. 14

*In re Ply Gem Indus., Inc. S'holders Litig.*,
    Civ. A. No. 15779-NC, 2001 WL 755133 (Del. Ch. June 26, 2001) ............................. 13

*In re The Limited, Inc. S'holder Litig.*,
    Civ. A. No. 17148-NC, 2002 WL 537692 (Del. Ch. Mar. 27, 2002) ............................. 13

*In re The Student Loan Corp. Derivative Litig.*,
    No. C.A. 17799, 2002 WL 75479 (Del. Ch. Jan. 8, 2002) ............................... 13

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991) ......................................................................... 6

*Kaplan v. Centex Corp.*,
    284 A.2d 119 (Del. Ch. 1971) ............................................................. 8

*Lewis v. Vogelstein*,
    699 A.2d 327 (Del. Ch. 1997) ............................................................. 8

*Luce v. Edelstein*,
    802 F.2d 49 (2d Cir. 1986) ............................................................... 15

*Mitzner v. Hastings*,
    No. C 04-3310 FMS, 2005 WL 88966 (N.D. Cal. Jan. 14, 2005) ................................ 10

*Mizel v. Connelly*,
    Civ. A. No. 16638, 1999 WL 550369 (Del. Ch. July 22, 1999) ................................ 12

*Pogostin v. Rice*,
    480 A.2d 619 (Del. 1984) .............................................................. 6, 7

*Rales v. Blasband*,
    634 A.2d 927 (Del. 1993) ........................................................... 6, 12, 13

*Ronzani v. Sanofi S.A.*,
    899 F.2d 195 (2d Cir. 1990) ............................................................. 15

*Steiner v. Meyerson*,
    Civ. A. No. 13139, 1995 WL 441999 (Del. Ch. July 19, 1995) ................................ 13

*Telxon Corp. v. Bogomolny*,
    792 A.2d 964 (Del. Ch. 2001) ............................................................ 13

*Wilson v. Tully*,
    676 N.Y.S.2d 531 (N.Y. App. Div. 1998) .................................................. 11

**STATUTES**

Fed. R. Civ. P.
    15(a) ................................................................................................................... 15

## I.    INTRODUCTION

Since at least 2006, a crisis has been brewing for subprime lenders.  Until late 2007, Defendants[1] caused American International Group, Inc. ("AIG" or the "Company") to issue statements to investors and analysts stating that AIG would not suffer, or would suffer minimally, from the subprime decline and subsequent collapse.  Then, in February 2008, in contradiction to Defendants' previous statements, the truth at last emerged – AIG has been materially impacted by the subprime market collapse, and as a result, had sustained a *$6 billion* decline in their mortgage-backed insurance contracts.

Despite knowledge of the massive actual and potential losses and write downs of mortgage-backed securities, the Defendants failed to fulfill their fiduciary duties to AIG by wrongfully approving a stock repurchase plan and causing the Company to repurchase $3.7 billion worth of stock at an average price of $67 per share – more than twice the current price of approximately $33 per share.  Defendants also caused or allowed the Company to disseminate false and misleading financial statements reassuring investors that AIG could not possibly be hit by this crisis and press releases that misstated and omitted key material information regarding the Company's true business prospects and financial condition.  Further, Defendants failed to prevent or remedy internal control deficiencies, which were later disclosed by AIG's auditor, PricewaterhouseCoopers LLC ("PWC").

In response to Defendants' misconduct, plaintiffs Marilyn Clark and Doris Staehr ("Plaintiffs") brought this shareholder derivative suit alleging state law claims and violations of sections 10(b), 10b-5 and 20(a) of the Securities Exchange Act of 1934.  Plaintiffs did not make a demand on AIG's Board of Directors ("Board") prior to filing this action because such a demand would have been a futile and useless act.  Defendants have now moved to dismiss this action based on a purported failure to adequately plead demand futility.

---

[1] Defendants Martin J. Sullivan ("Sullivan"), Edmund S. Tse ("Tse"), Marshall A. Cohen ("Cohen"), Martin D. Feldstein, Ellen V. Futter, Stephen L. Hammerman, Richard C. Holbrooke, Fred H. Langhammer, George L. Miles ("Miles"), Morris W. Offit ("Offit"), James F. Orr, Viriginia M. Rometty, Michael H. Sutton ("Sutton"), Robert B. Willumstad and Frank G. Zarb, collectively referred to as "Defendants."

At the time of the original filing of this case, the Board was comprised of fifteen directors. Accordingly, demand is futile if Plaintiffs plead facts sufficient to create a reasonable doubt that eight of the directors would have been able to impartially consider a demand. In their motion to dismiss, Defendants effectively concede that demand on the two inside directors, defendants Sullivan (Chief Executive Officer) and Tse (Senior Vice-Chairman –Life Insurance), and one insider trading director, defendant Cohen, would have been futile. Therefore, in order to plead demand futility, Plaintiffs must only demonstrate that a demand on five of the remaining twelve directors would have been futile.

As demonstrated herein and in the Complaint,[2] in addition to defendants Sullivan, Tse and Cohen, demand would also have been futile as to the remaining Defendants due to their express approval of the stock repurchase, which was not a valid exercise of business judgment. In February 2007 – the same month that the top subprime mortgage lenders began announcing considerable losses and potential restatements – Defendants approved a massive $8 billion stock buyback program. Over the next few months, in connection with that program and despite the crumbling mortgage market, the Company repurchased $3.7 billion of its own stock at an average price of $67 per share.

Further, demand would have been futile as to defendants Miles, Offit and Sutton. Specifically, as members of AIG's Audit Committee, these defendants were responsible for, among other things, reviewing and discussing earnings press releases and financial information and earnings guidance provided to analysts and rating agencies. Rather than fulfill these duties, defendants Miles, Offit and Sutton made false and misleading statements in financial statements and press releases concerning AIG's subprime exposure and/or ignored clear red flags associated with AIG's subprime liability. As detailed below, in light of their heightened duties, these three defendants face a sufficiently substantial likelihood of liability for breaching their fiduciary duties.

---

[2] The term "Complaint" refers to the Verified Consolidated Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment and Violations of the Securities and Exchange Act of 1934, filed on February 15, 2008. All paragraph references ("¶___" or "¶¶____") are to the Complaint, unless otherwise noted.

Accordingly, there is a reasonable doubt as to whether defendants Miles, Offit and Sutton were disinterested for purposes of considering a demand.

For these reasons and those detailed below, demand on AIG's Board would have been futile, and defendant AIG's motion to dismiss should be denied in its entirety.

## II.    STATEMENT OF FACTS

### A.    Background

AIG is a financial investment company, providing a wide range of financial and insurance services.  ¶2.  From the summer of 2006 until November of 2007, defendants claimed that the Company's portfolio was so sufficiently diversified that the mortgage market would have to reach "Depression proportions" before it negatively impacted the Company.  ¶¶2, 77.  Throughout this period, Defendants also touted the "significant progress throughout the year in improving [the Company's] financial control environment, providing greater transparency in our financial disclosures and remaining on the forefront of good corporate governance."  ¶71 (alteration in original).  During this same period, defendants Cohen, Neuger, Schreiber and Wisner sold over $6 million of their personally owned AIG shares.  ¶91.

### B.    A Subprime Mortgage Crisis Emerges

A subprime borrower is someone with a low credit score, higher debt-to-income ratio or other characteristics associated with a high probability of default relative to "prime" or less-risky borrowers.  ¶49.  In an environment of appreciating home prices and low interest rates, subprime borrowers are typically able to stay current due to the rising equity in their property.  But in an environment of depreciating home prices, increasing default rates are the norm.  During the late summer of 2006, the "bubble" burst and default rates began increasing rapidly .  ¶¶50-51.

In August 2006, the market volatility due to increasing defaults began gaining national media attention.  ¶52.  Major Wall Street institutions, including massive hedge funds, began reporting significant losses in income on subprime mortgages as interest rates began rising.  *Id.*  Interest rate increases continued through September and October 2006, prompting federal banking regulators to warn housing lenders that it was their responsibility to ensure that consumers who were offered subprime mortgages would be in a position to repay them.  ¶53.  Throughout December, national

- 3 -

publications reported that subprime mortgage delinquencies were mounting, pointing out the extensive ramifications to mortgage-backed securities in light of the decline in housing prices and increase in mortgage defaults and foreclosures.  ¶54.

As interest rates and defaults increased, the subprime market fell on even harder times.  In December 2006, a small subprime lender filed for bankruptcy.  ¶55.  This was followed by another subprime bankruptcy filing in January 2007, by a subprime lender owned in part by Merrill Lynch. ¶56.  A third subprime lender announced it would make no more new loans, then filed for bankruptcy at the end of January 2007.  *Id*.  A fourth subprime lender bankruptcy filing followed within two weeks.  *Id*.  Then, on February 7, 2007, the largest subprime lender, New Century Financial Corporation, announced that it would restate financial results for three quarters of 2006 to correct errors regarding allowances for loan repurchase losses.  ¶57.  The same day, HSBC announced that it had set aside $10.5 billion dollars to cover bad loans in the United States.  *Id*.  On February 14, 2007, the second-largest subprime lender, Accredited, announced a Q4 loss of $37.8 million.  ¶58.  New Century filed for bankruptcy protection in April 2007.  ¶59.  In May 2007, UBS shut down one of its hedge funds after incurring a $123 million loss due to its exposure to the United States subprime market.  ¶60.  In June 2007, two of Bear Stearns' major hedge funds collapsed due to heavy investments in securities backed by subprime mortgages.  *Id*.

Throughout this time period, Defendants adamantly denied that AIG had any subprime exposure or that ***any*** of its investment portfolios would be negatively impacted.  In truth, AIG faces exposure to the subprime mortgage crisis on several fronts.  ¶63.  AIG has approximately $94.6 billion invested in mortgage backed securities and the Company's mortgage-insurance business has written over $25.9 billion in policies.  *Id*.  Further, AIG has a mortgage lending segment facing an increasing borrower delinquency rate.  *Id*.

### C.    The Stock Repurchase Program

Despite the above potential exposure, all of the Defendants authorized a massive stock buyback of up to $8 billion of the Company's shares.  ¶87.  Under the Board's authorization, the Company has (thus far) bought back over $3.7 billion worth of the Company's own shares at an average price of approximately $67.89 per share.  *Id*.  AIG stock is currently trading at

- 4 -

approximately $33 per share, half of what the Company paid for its own stock in the buyback.  In short, the Individual Defendants have thus far wasted over ***$1.9 billion*** of AIG's money by approving and instituting the stock repurchase program.

### D.   Defendants Announce Massive Portfolio Losses and Internal Control Deficiencies

Despite statements that the Company would not suffer any losses, and an authorization of the repurchase program (designed to indicate to the market that Defendants thought the Company's shares were undervalued), Defendants announced a massive $1.4 billion loss in AIG's investment portfolio, credit-swap portfolio and mortgage insurance business in November 2007.  ¶¶3, 79.  Even after announcing this loss, defendant Sullivan reassured the market that housing exposure was "manageable" and that the Company's credit portfolio was so sound that the chance of the Company's financial products unit sustaining economic losses was "close to zero."  ¶80.  But again, this was not the real story.  On February 11, 2008, PWC announced that faulty accounting may have understated the Company's losses on certain holdings.  ¶83.  In particular, the Company was forced to disclose that it would need to alter the way it valued credit-default swaps involving collateralized-debt obligations ("CDOs"),[3] which had actually lost a total of approximately $6 billion in value – an amount significantly greater than the previously disclosed $1.4 billion figure.  ¶82.  The disclosure cast doubt on AIG's past statements that the Company did not face any significant problems stemming from the ongoing credit crisis and also raised concerns that AIG would report further losses.  *Id*.

## III.   APPLICABLE LEGAL STANDARDS FOR DEMAND FUTILITY

Pursuant to Federal Rules of Civil Procedure, Rule 23.1, the plaintiff in a shareholder's derivative action must allege either: (a) that he has made a demand on the corporation's board of directors to take the requested action; or (b) the reasons for not making demand, i.e., the reasons why demand is futile.  AIG is headquartered in New York, but incorporated in Delaware.  ¶11.

---

[3] A CDO is a type of asset-backed security and structured credit product, designed to minimize risk exposure in a portfolio of fixed income assets.  ¶81.  CDOs serve as an important funding vehicle for portfolio investments in credit-risky, fixed income assets.

Therefore, the parties are in agreement that the substantive laws of Delaware regarding demand futility apply. *See* Memorandum in Support of Motion to Dismiss by Nominal Defendant American International Group, Inc. ("AIG's Mem.") at 4-5. "[A] court that is entertaining a derivative action ... must apply the demand futility exception as it is defined by the law of the State of incorporation." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108-09 (1991).

Under Delaware law, it is well settled that demand need not be alleged if the facts pled show that such a demand would have been futile. *Aronson v. Lewis*, 473 A.2d 805, 807 (Del. 1984), *overruled on other grounds sub nom. Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). In assessing demand under Delaware law, ***all reasonable inferences must be drawn in the light most favorable to the plaintiff***. *In re Cendant Corp. Derivative Action Litig.*, 189 F.R.D. 117, 127 (D.N.J. 1999). Moreover, a plaintiff is not required to plead evidence, ***nor is proof of success on the merits required***. *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).

Where a board decision is at issue, Delaware law applies the two pronged *Aronson* test, which excuses demand: (i) where a majority of the board is not disinterested (or independent); or (ii) the challenged acts were not the product of the board's valid exercise of business judgment. *Aronson*, 473 A.2d at 814. "These prongs are in the disjunctive. Therefore, if either prong is satisfied, demand is excused." *Brehm*, 746 A.2d at 256. As to the second "business judgment" prong, the Court must focus "on the substantive nature of the challenged transaction and the board's approval thereof." *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984), *overruled on other grounds sub nom. Brehm*, 746 A.2d at 244.

## IV. DEMAND ON THE AIG BOARD WOULD HAVE BEEN FUTILE

### A. The Board's Decision to Approve the Stock Repurchase Was Not a Valid Exercise of Valid Business Judgment

Demand is excused where the pleadings "create a reasonable doubt that the directors' action was entitled to the protections of the business judgment rule." *Aronson*, 473 A.2d at 808. Such reasonable doubt is shown where the challenged action is alleged to be "so devoid of a legitimate corporate purpose as to be a waste of assets." *See In re Countrywide Fin. Corp. Derivative Litig.*, Lead Case No. CV-07-06923-MRP (MANx), 2008 WL 2064977, at *33 (C.D. Cal. May 14, 2008);

*Pogostin*, 480 A.2d at 626.  Reasonable doubt is also apparent where allegations support the inference that the Board has made "an unintelligent or unadvised judgment."  *In re NVF Co. Litig.*, Civ. A. No. 9050, 1989 WL 146237, at *5 (Del. Ch. 1989).  Where, as here, Defendants invoke protection under the business judgment rule, the Court must focus on the substantive nature of the action to determine if the transaction had a legitimate corporate purpose.  *Pogostin*, 480 A.2d at 619, 624, 626.

In a recent similar shareholder derivative action, plaintiffs brought 10(b) and breach of fiduciary duty claims against defendants relating to misleading statements, insider selling and failing to inform the public as to the long term risks and true nature of loans originated by Countrywide Financial Corporation, a large mortgage lender.  *Countrywide*, 2008 WL 2064977, at *5.  Plaintiffs alleged that defendants had committed waste by wrongfully authorizing a stock repurchase program, despite knowledge of massive losses, thus demand was futile as to the board.  *Id*. at 33.  The Court agreed.  *Id.*  Because the Court found a strong inference of scienter as to several individual defendants for misleading the public regarding the Company's financial situation while engaging in insider selling, there was "reason to doubt that the stock repurchase program, executed in late 2006, was the product of the Board's 'valid exercise of business judgment'."  *Id.*  The Court thus found that demand was futile with respect to the stock repurchase program.  *Id.*

Similarly, here Plaintiffs allege that Defendants approved a stock buyback of up to $8 billion of the Company shares in February 2007.  ¶87.  Normally, a stock repurchase plan is implemented because a company's directors believe the company's stock price is below its true value.  Thereafter, Defendants directed the Company to repurchase over $3.7 billion of its stock at an average price of $67 per share (*id.*) – a price substantially higher than AIG's current share price, which has plunged to $33 per share after announcing massive losses from the Company's subprime exposure.  As in *Countrywide*, AIG's share price was artificially inflated because of improper accounting and financial reporting and false and misleading statements and press releases hiding the extent of the Company's exposure to the subprime crisis.  *Id.*  Similar to *Countrywide*, Plaintiffs here have also pled that Defendants knew or recklessly ignored the multiple red flags indicating that AIG was not going to emerge from the subprime crisis unscathed.  ¶64.  Further, Plaintiffs have also brought

§10(b) of the Securities Exchange Action of 1934 claims against all Defendants, adequately pleading scienter as to these defendants. *See Plaintiffs' Opposition to the Outside Directors' Motion to Dismiss* at Section III.B. The Defendants knew that AIG faced material subprime liability, yet continued to deceive the market by repeatedly making statements to the contrary. ¶¶64, 88. At the same time, Defendants directed the Company to repurchase its own stock, knowing its value was inflated because AIG was not adequately exposing its exposure to the subprime crisis. Because the stock repurchase had no legitimate business purpose, demand is futile as to the entire Board due to their participation in authorizing stock repurchases of $3.7 billion.

Defendants cannot and do not claim that the funds that AIG overpaid for its own stock served any legitimate purpose whatsoever. Instead, Defendants assert that plaintiffs fail to establish that the directors had knowledge of or consciously disregarded any such wrongdoing. AIG's Mem. at 19-20. This argument fails because Defendants are relying upon the business judgment rule's presumption that they informed themselves of the propriety of the stock repurchase before approving it. *Aronson*, 473 A.2d at 812 ("It is a presumption that in making a business decision the directors of a corporation acted on an ***informed*** basis  ...")[4] (citing *Kaplan v. Centex Corp.*, 284 A.2d 119, 124 (Del. Ch. 1971)). This presumption includes knowledge of the widespread subprime market meltdown, which alerted the Board as to potential inaccuracies and future losses for AIG. ¶¶49-64. The Board, however, did not suspend the repurchase program. Instead, they caused the Company to repurchase over 55 million of its own shares for over $3.7 billion at double the current stock price, wasting $1.9 billion of Company funds.[5] Thus, Defendants actions are not protected by the business judgment rule. *See Countrywide*, 2008 WL 2064977, at *33.

Defendants also assert that Plaintiffs cannot point to later events, suggesting that the stock may have been worth less at the time of repurchase than the Company paid, as justification Defendants' decision to approve the repurchase was inappropriate. This misses the point. Plaintiffs

---

[4] Here, as throughout, all emphasis is deemed added and all citations and footnotes are deemed omitted unless otherwise noted.

[5] Further, such allegations of waste are "inherently factual and not easily amenable to determination on a motion to dismiss." *Lewis v. Vogelstein*, 699 A.2d 327, 339 (Del. Ch. 1997).

here have pled that Defendants knew of the subprime crisis, and of the losses that AIG was certain to suffer due to their subprime exposure, ***at the time they approved the stock repurchase***.  ¶86.  Indeed, how could they not?  At the time Defendants considered and approved the stock repurchase, several small subprime lenders had already declared bankruptcy.  ¶¶55-56.  The largest subprime lender, New Century, had just announced that it would restate three quarters of earnings for 2006.  ¶57.  HSBC had announced that it had set aside $10.5 billion to cover bad loans in the United States.  *Id.*  Accredited, the second largest subprime lender, had announced a massive Q4 loss and warned about bad debts in its portfolio.  ¶58.  The subprime crisis was not subtlety buried in the back of a newspaper, but rather, was at the forefront of the media.  This is not, as defendants suggest, a case of using "20/20 hindsight to second guess a board's decision."  AIG's Mem. at 20.  There were no "later events" that make the decision a poor one.  Rather, the knowledge that Defendants possessed at the time they made the decision to approve the repurchase made it so that the decision to approve the repurchase was not a valid exercise of business judgment.

Therefore, because there is a reasonable doubt that the Board's decision to institute AIG's stock repurchase program served any legitimate corporate purpose, the business judgment rule's presumption that the decision was the product of valid business judgment is rebutted and demand is futile as to all Defendants.  *See Countrywide*, 2008 WL 2064977.  Because demand is futile as to all fifteen members of the Board, defendant AIG's motion to dismiss should be denied.

**B.    Demand on Defendants Miles, Offit and Sutton, as Members of the Audit Committee, Would Have Been Futile Because They Face a Sufficiently Substantial Likelihood of Liability**

Defendants Miles, Offit and Sutton were members of AIG's Audit Committee during the relevant period.  ¶¶66, 97, 114.  Accordingly, these defendants can be held liable for their failure to adequately oversee the Company's internal controls and/or financial reporting process, as well as for their participation in the dissemination of false and misleading statements.  *See Cendant*, 189 F.R.D. at 129-30 (finding that demand is futile when plaintiff alleges directors published false statements in public corporate documents); *In re Lernout & Hauspie Sec. Litig.*, 286 B.R. 33, 36, 38-39 (Bankr. D. Mass. 2002) (denying motion to dismiss securities claim against "outside" directors comprising audit committee for securities fraud even under heightened pleading standard).

### 1. Defendants Miles, Offit and Sutton's Duties as Members of the Audit Committee

The members of the Audit Committee stood in a special relationship to the Company which rendered them responsible for the accuracy, and liable for the inaccuracy, of AIG's press releases and Securities and Exchange Commission ("SEC") filings. *Mitzner v. Hastings*, No. C 04-3310 FMS, 2005 WL 88966, at *6 (N.D. Cal. Jan. 14, 2005) (membership on the audit committee can result in a special relationship leading to personal liability for allegedly false or misleading information conveyed in annual reports and press releases). As members of the Audit Committee, defendants Miles, Offit and Sutton were responsible for, among other things, reviewing and discussing earnings press releases and financial information and earnings guidance provided to analysts and rating agencies. ¶¶66, 97. Pursuant to their membership on the Audit Committee, defendants Miles, Offit and Sutton reviewed and approved all information disseminated in AIG's financial statements. *Id.* To satisfy their fiduciary obligations, defendants Miles, Offit and Sutton were required to take an active role in the review and dissemination of the Company's internal controls, financial statements and communications concerning its results, operations and prospects, pursuant to their obligations under AIG's audit committee charter. *Id.*

### 2. Defendants Miles, Offit and Sutton Face a Sufficiently Substantial Likelihood of Liability for Breaching Their Fiduciary Duties

As noted above, the Audit Committee is specifically responsible for reviewing and discussing the integrity of the Company's financial statements, press releases and earnings guidance provided to analysts and rating agencies. *See In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 222 (S.D.N.Y. 1999) ("An outside director and audit committee member who signs off on the financials can be presumed to have 'the power to direct or cause the direction of the management and policies of' the corporation."). Where members of the audit committee permit or approve the dissemination of false or misleading press releases, they face a sufficient likelihood of liability for their actions and demand against those directors is futile. *See Felker v. Anderson*, No. 04-0372, 2005 WL 602974, at *3 (W.D. Mo. Feb. 11, 2005) (holding that demand was futile where plaintiff particularly alleged that defendants permitted and/or approved of the dissemination of false or misleading press releases, did not seek to recover any part of the damages suffered by the company, and concealed information

from the public); *In re First Capital Holdings Corp.*, 146 B.R. 7, 12 (Bankr. C.D. Cal. 1992) (explaining that "where members of the board of directors have permitted or participated in alleged wrongdoing, or conspired with others, the requirement that a shareholder make a demand upon the board, in order to bring and maintain a derivative action, is excused as futile").[6]

Here, Plaintiffs particularly allege who received, reviewed and/or approved each of the false and misleading statements relevant to this action.[7]  ¶¶68-82, 97, 100, 104.  Plaintiffs also allege defendants Miles, Offit and Sutton failed to take any action to fulfill their duties, despite the existence of long-standing and substantial accounting issues involving subprime loans and CDOs.[8] ¶¶50-64, 97.  The accounting improprieties at issue include serious deficiencies in AIG's internal valuation methods according to their auditor, PWC, and problems with valuation of credit-default swaps, leading to an approximately $6 billion loss.  ¶¶83-84.  The significance of the improper accounting practices is evidenced in that AIG's value dropped nearly 12% the Company announced that it needed to "alter" the way it valued credit-default swaps.  *Id.*  Since the time the Complaint

---

[6]  Additionally, motions to dismiss against audit committee members in numerous securities actions have been denied despite higher pleading standards in those actions. *See*, *e.g.*, *In re First Merchs. Acceptance Corp. Sec. Litig.*, No. 97 C 2715, 1998 WL 781118, at *1 (N.D. Ill. Nov. 4, 1998) (motion to dismiss denied where audit committee members were sued in connection with financial statements that inflated income by failing to recognize large uncollectible loan costs); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620 (E.D. Va. 2000) (motion to dismiss mostly denied where audit committee members accused of participating in efforts to inflate company's revenue).

[7]  Defendants cite a number of cases to support their position that demand would not have been futile because Plaintiffs have purportedly failed to plead knowledge of the accounting improprieties or the Audit Committee's failure to dedicate sufficient time to its responsibilities. AIG's Mem. at 12-15. However, the factual allegations in the Complaint establish that defendants Miles, Offit and Sutton affirmatively breached their Audit Committee duties, actively approving and issuing AIG's false financial statements and SEC filings in addition to ignoring "red flags." *See* ¶97. Therefore, Defendants' attempt to categorize Plaintiffs' allegations against the Audit Committee members as merely a failure to oversee is incorrect.

[8] Defendants argue that Plaintiffs do not identify any information available to Defendants suggesting any reason for Defendants to question internal controls or potential subprime exposure, citing *In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d 873 (D. Md. 2005) and *Wilson v. Tully*, 676 N.Y.S.2d 531 (N.Y. App. Div. 1998).  AIG's Mem. at 16.  Again, Plaintiffs do not plead that the directors failed to implement adequate internal controls.  Thus, these cases are inapposite.

was filed, Fitch Ratings also announced that it may lower AIG's AA credit rating because of AIG's "weakness in internal controls" coupled with "current market conditions, contributing to uncertainty regarding the valuation" of the Company's portfolio. Rather than fulfill their duties to oversee AIG's accounting and financial reporting processes and review the Company's financial statements, defendants Miles, Offit and Sutton took no action to prevent or remedy the improper accounting practices or to prevent internal weaknesses and yet approved the stock repurchase plan.

As Plaintiffs' allegations demonstrate a sustained failure of the Audit Committee to exercise oversight and, therefore, lack of good faith by these defendants, they face a substantial likelihood of liability. Therefore, demand as to defendants Miles, Offit and Sutton is futile.

### C.    Defendants Concede that Demand on Sullivan, Tse and Cohen Would Have Been Futile

Defendants do not even contest Plaintiffs' allegations that a demand on defendants Sullivan, Tse and Cohen would have been futile. AIG's Mem. at 9-10. This is not surprising because particular allegations that an employee-director receives substantial financial compensation from his position, or that a director improperly benefited from the sale of stock while in possession of knowledge that financial results have been overstated, are sufficient to raise a reasonable doubt regarding the employee-director's independence. *See Rales*, 634 A.2d at 937 ("there is a reasonable doubt that [an employee-director] can be expected to act independently considering his substantial financial stake in maintaining his current offices"); *In re Cooper Co., Inc.*, No. 12584, 2000 WL 1664167, at *6-*7 (Del. Ch. Oct. 31, 2000) (allegation that employee-directors "'owed their positions and their livelihood to maintaining the good will'" of other directors "creates reason to doubt that [employee-directors] could have responded impartially to a demand"); *Mizel v. Connelly*, Civ. A. No. 16638, 1999 WL 550369, at *3 (Del. Ch. July 22, 1999) ("Since [employee-directors] each derive their principal income from their employment at [the corporation], it is doubtful that they can consider the demand on its merits without also pondering whether an affirmative vote would endanger their continued employment.").[9]

_____

[9] *Accord In re The Limited, Inc. S'holder Litig.*, Civ. A. No. 17148-NC, 2002 WL 537692, at *5 (Del. Ch. Mar. 27, 2002); *In re The Student Loan Corp. Derivative Litig.*, No. C.A. 17799, 2002 WL 75479, at *3 (Del. Ch. Jan. 8, 2002); *Telxon Corp. v. Bogomolny*, 792 A.2d 964, 974 (Del. Ch.

In the case at bar, Plaintiffs allege that at the time this action was commenced, defendant Sullivan was AIG's CEO, while defendant Tse was the Company's Senior Vice Chairman - Life Insurance. ¶¶12-13.  In these capacities, defendants Sullivan and Tse received a substantial salary and other compensation. *Id.*  As such, these defendants undoubtedly had a "substantial financial stake in maintaining [their] current offices." *See Rales*, 634 A.2d at 937 (finding a reasonable doubt regarding independence when the officer's annual compensation was $300,000 per year); *Student Loan Corp.*, 2002 WL 75479, at *3 (allegations that directors owe their livelihood to their employer, without elaboration on the exact compensation, is sufficient to show lack of independence).

In an insider selling context, a director is interested where "plaintiffs have pled particularized facts regarding the directors that create a sufficient likelihood of personal liability because they have engaged in material trading at a time when (one can infer from particularized pled facts that) they knew material, non-public information about the company's financial condition." *Guttman v. Huang*, 823 A.2d 492, 502 (Del.Ch. 2003); *See also Brophy v. Cities Serv. Co.*, 70 A.2d 5, 8 (Del. Ch. 1949). Here, Plaintiffs allege that defendant Cohen, who was a director at the time of the filing of the original complaint, sold his personally held shares while in possession of material, non-public information.  ¶¶22, 91, 100.  On November 28, 2006, the early stages of the emerging subprime meltdown, defendant Cohen sold 10,093 of his personally held shares for over $711,556 in proceeds. *Id.*  Plaintiffs have also pled that Cohen knew the misstatements would create an inflated stock price.

Consequently, demand is excused with respect to defendants Sullivan, Tse and Cohen.

### D.    The Totality of the Circumstances Demonstrate the Futility of Demand

Although the above analysis demonstrates the futility of any demand, a consideration of the totality of the circumstances also confirms that demand was futile.  Notwithstanding Plaintiffs' ability to overcome each criticism lobbed by Defendants at the sufficiency of their demand futility allegations, such parsing of Plaintiffs' claims is not the proper demand futility analysis.  Although Plaintiffs have made various particular allegations pertaining to demand futility, dismissal does not

---

2001); *In re Ply Gem Indus., Inc. S'holders Litig.*, Civ. A. No. 15779-NC, 2001 WL 755133, at *6-*7 (Del. Ch. June 26, 2001); *Steiner v. Meyerson*, Civ. A. No. 13139, 1995 WL 441999, at *10 (Del. Ch. July 19, 1995).

hinge on any particular allegation.  Instead, the court should engage in a single demand futility analysis for the entire action, taking into account of the totality of a plaintiff's allegations.  *See In re Cendant*, 189 F.R.D. at 129; *In re Oxford Health Plans, Inc. Sec. Litig.*, 192 F.R.D. 111, 118 (S.D.N.Y. 2000) (denied motion to dismiss applying Delaware law) (in evaluating demand futility the court considered the totality of the circumstances).

As discussed herein, Plaintiffs' allegations are clearly sufficient for the Court to conclude that there is a reasonable doubt that a majority of the Board could not have impartially considered a demand to commence this action.  In addition to the allegations discussed above that raise a reasonable doubt as to the good faith exercise of business judgment by the Board in approving the stock repurchase, Plaintiffs have pled the following additional facts which support their argument: (i) defendants Sullivan, Tse and Cohen cannot impartially consider a demand because of their employment and/or personal benefits obtained during the relevant period, ¶¶12, 13, 22, 91; and (ii) defendants Miles, Offit and Sutton face a substantial likelihood of liability due to their breach of fiduciary duties for failing to fulfill their duties as members of the Audit Committee.  Although Defendants contend that these particular allegations standing alone are insufficient to overcome Plaintiffs' demand futility hurdle, they should nevertheless be reviewed in totality with all of Plaintiffs' demand futility allegations.  Based on the totality of the circumstances, Plaintiffs have overcome Defendants' arguments that each member, let alone eight members, of the Board could fairly evaluate Plaintiffs' claims, or is disinterested and independent.  Thus, demand is excused as futile and the Complaint must be sustained in its entirety.

## V.    CONCLUSION

In light of the foregoing, nominal defendant AIG's motion to dismiss should be denied it its entirety.[10]

DATED: June 16, 2008                             Respectfully submitted,

                                                 LAW OFFICES OF THOMAS G. AMON
                                                 THOMAS G. AMON


                                                        s/Thomas G. Amon
                                                 _____
                                                    THOMAS G. AMON (TGA-1515)

                                                 250 West 57th Street, Suite 1316
                                                 New York, N.Y. 10107
                                                 Telephone: (212) 810-2431
                                                 Facsimile:  (212) 810-2427

                                                 ROBBINS UMEDA & FINK, LLP
                                                 BRIAN J. ROBBINS
                                                 JEFFREY P. FINK
                                                 FELIPE J. ARROYO
                                                 JULIA M. WILLIAMS
                                                 610 West Ash Street, Suite 1800
                                                 San Diego, CA 92101
                                                 Telephone: (619) 525-3990
                                                 Facsimile:  (619) 525-3991

                                                 Co-Lead Counsel for Plaintiffs

343852_6.DOC

---

[10]  Plaintiffs are confident that the Complaint adequately pleads demand futility. However, if the Court finds differently, leave to amend the pleadings should be granted freely "when justice so requires." Fed. R. Civ. P. 15(a).  *See also Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990); *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986).

- 15 -

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2008, the foregoing document was filed with the Clerk of the

Court for the U.S. District Court, using the electronic case filing system of the court.  The electronic

case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented

in writing to accept this Notice as service of documents by electronic means.  I hereby certify that I

have served the foregoing document to all individuals who have not consented to electronic

notification by mail.



s/Thomas G. Amon
THOMAS G. AMON