**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE AMERICAN INTERNATIONAL GROUP, INC. 2007 DERIVATIVE LITIGATION | ) Lead Case No. 07-CV-10464 (LAP) |
| | ) |
| | ) (Derivative Action) |
| ———————————————————— | ) |
| | ) |
| This Document Relates To: | ) |
| | ) |
| ALL ACTIONS. | ) |
| | ) |
| | ) |
| ———————————————————— | ) |

## OPPOSITION TO THE OUTSIDE DIRECTORS' MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... iii

I.      INTRODUCTION ................................................................................................1

II.     STATEMENT OF FACTS ....................................................................................3

        A.     Defendants Deny AIG Had Any Exposure from Subprime Weaknesses ...............3

        B.     The Truth Slowly Emerges ........................................................................4

III.    PLEADING STANDARDS....................................................................................5

        A.     Legal Standard for Motion to Dismiss.......................................................5

        B.     Notice Pleading Applies to Plaintiffs State Law Claims ...........................6

IV.     THE COMPLAINT STATES A CLAIM UNDER SECTION 10(B) ................................7

        A.     The Complaint Pleads Material False and Misleading Statements with
               Particularity..............................................................................................8

        B.     The Complaint Advances A Strong and Compelling Inference of Scienter..........10

               1.     Defendants Recklessly Authorized the Stock Repurchase and
                      Made False and Misleading Statements While in Possession of
                      Knowledge Contradicting Their Public Statements...................................11

               2.     The Complaint Adequately Alleges Scienter Against Defendants
                      Sullivan, Tse and Bensinger .....................................................................14

        C.     The Complaint Pleads Control Liability Against Defendants Sullivan,
               Miles, Offit and Sutton For Violation of §20a.......................................15

V.      THE COMPLAINT STATES A CLAIM FOR THE REMAINING STATE LAW
        CAUSES OF ACTION ........................................................................................16

        A.     The Complaint States a Claim for Breach of Fiduciary Duty...............16

        B.     The Complaint Pleads Facts to Demonstrate Unjust Enrichment Against
               All Defendants ........................................................................................17

        C.     The Complaint Demonstrates that All Defendants Wasted Corporate
               Assets ......................................................................................................18

VI.     IF THE MOTION TO DISMISS IS GRANTED, PLAINTIFFS SHOULD BE
        GRANTED LEAVE TO REPLEAD ..................................................................19

VII.    CONCLUSION.............................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Basic, Inc. v. Levinson,*
    485 U.S. 224 (1988) ........................................................................... 9

*Brehm v. Eisner,*
    746 A.2d 244 (Del. 2000) ............................................................... 19

*Brickman v. Tyco Toys, Inc.,*
    722 F. Supp. 1054 (S.D.N.Y. 1989) ................................................ 8

*Chill v. Gen. Elec. Co.,*
    101 F.3d 263 (2d Cir.1996) ........................................................... 14

*Conley v. Gibson,*
    355 U.S. 41 (1957) ........................................................................... 5

*Foman v. Davis,*
    371 U.S. 178 (1962) ....................................................................... 19

*Ganino v. Citizens Utils. Co.,*
    228 F.3d 154 (2d Cir. 2000) ............................................... 8, 10, 15

*In re Abbott Labs. Derivative S'holders Litig.,*
    325 F.3d 795 (7th Cir. 2003) ......................................................... 17

*In re Ames Dep't Stores, Inc. Stock Litig.,*
    991 F.2d 953 (2d Cir. 1993) .......................................................... 10

*In re Carter-Wallace, Inc., Sec. Litig.,*
    220 F.3d 36 (2d Cir. 2000) ............................................................ 11

*In re Countrywide Fin. Corp. Derivative Litig.,*
    No. CV-07-06923-MRP, 2008 WL 2064977 (C.D. Cal. May 14, 2008) ......................... 7

*In re Nortel Networks Corp. Sec. Litig.,*
    238 F. Supp. 2d 613 (S.D.N.Y. 2003) ............................................ 11

*In re Tower Air, Inc.,*
    416 F.3d 229 (3d Cir. 2005) ............................................................ 7

*In re Walt Disney Co. Derivative Litig.,*
    906 A.2d 27 (Del. 2006) ................................................................. 17

*IUE AFL-CIO Pension Fund v. Herrmann,*
    9 F.3d 1049 (2d Cir. 1993) .............................................................. 6

*Jackson Nat'l Life Ins. Co. v. Kennedy,*
  741 A.2d 377 (Del. Ch. 1999) ................................................................ 16, 18

*Kaiser v. Stewart,*
  No. 96-6643, 1997 WL 476455 (E.D. Pa. Aug. 19, 1997) ................................ 6

*Kalnit v. Eichler,*
  264 F.3d 131 (2d Cir. 2001) .................................................................... 11

*Luce v. Edelstein,*
  802 F.2d 49 (2d Cir. 1986) .................................................................. 7, 19

*Michaels Bldg. Co. v. Ameritrust Co., N.A.,*
  848 F.2d 674 (6th Cir. 1988) ..................................................................... 7

*Michelson v. Duncan,*
  407 A.2d 211 (Del. 1979) ........................................................................ 18

*Mickowski v. Visi-Trak Worldwide, LLC,*
  298 F. Supp. 2d 692 (N.D. Ohio 2003) ........................................................ 7

*No. 84 Employer-Teamster Joint Council Pension Fund v. Am. W. Holding Corp.,*
  320 F.3d 920 (9th Cir. 2003) .................................................................... 16

*Novak v. Kaskas,*
  216 F.3d 300 (2d Cir. 2000) .......................................................... 11, 12, 14

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.,*
  380 F.3d 1226 (9th Cir. 2004) .................................................................. 11

*Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.,*
  No. 00 Civ. 8688 (WHP), 2002 WL 362794 (S.D.N.Y. Mar. 6, 2002) ................ 6, 7

*Ronzani v. Sanofi, S.A.,*
  899 F.2d 195 (2d Cir. 1990) .................................................................... 19

*Ross v. A.H. Robins Co.,*
  607 F.2d 545 (2d Cir. 1979) ...................................................................... 7

*Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,*
  748 F.2d 774 (2d Cir. 1984) ...................................................................... 6

*S.E.C. v. First Jersey Secs., Inc.,*
  101 F.3d 1450 (2nd Cir. 1996) ................................................................. 16

*Schock v. Nash,*
  732 A.2d 217 (Del. 1999) ........................................................................ 18

*Schupak v. Florescue,*
  No. 92 Civ. 1189 (JFK), 1993 WL 256572 (S.D.N.Y. July 8, 1993) ................... 6

*Sheldon v. Vermonty,*
    31 F. Supp. 2d 1287 (D. Kan. 1998) ................................................................. 6

*Stone ex. rel. AmSouth Bancorporation v. Ritter,*
    No. 93, 2006, 2006 WL 3169168 (Del. Nov. 6, 2006) ..................................... 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    127 S. Ct. 2499 (2007) ......................................................................... 10, 14, 15

*Tri-Med Fin. Co. v. Nat'l Century Fin. Enter., Inc.,*
    No. 98-3617, 2000 WL 282445 (6th Cir. Mar. 6, 2000) .................................... 7

*U. S. v. Kearns,*
    595 F.2d 729 (D.C. Cir. 1978) ........................................................................... 6

**STATUTES**

15 U.S.C.
    §78u-4(b)(1)(B) .................................................................................................. 8

17 C.F.R.
    §230.405............................................................................................................ 16

## I.    INTRODUCTION

This is a derivative action brought by plaintiffs Marilyn Clark and Doris Staehr ("Plaintiffs") on behalf of nominal defendant American International Group, Inc. ("AIG") against certain of the Company's officers and directors.[1]  Defendants breached their fiduciary duties to AIG by issuing false and misleading statements concerning AIG's future financial prospects and exposure to losses resulting from the subprime market crisis.  Further, the Director Defendants breached their fiduciary duties by approving a stock repurchase program, despite knowing the negative impact the subprime meltdown would have on the Company's derivative and investment portfolios and stock price.

On Monday, February 11, 2008, AIG announced that its independent auditor, PricewaterhouseCoopers LLC ("PWC"), found evidence of faulty accounting.  ¶¶83-85.[2]  AIG also disclosed that it would need to alter the way it valued credit-default swaps[3] involving collateralized-debt obligations ("CDOs"),[4] which had declined by $4.88 billion in value in October and November

---

[1] For purposes of this motion, the "Director Defendants" are defendants Martin J. Sullivan ("Sullivan"), Edmund S. W. Tse ("Tse"), Marshall A. Cohen ("Cohen"), Martin D. Feldstein, Ellen V. Futter, Stephen L. Hammerman, Richard C. Holbrooke, Fred H. Langhammer, George L. Miles, Jr. ("Miles"), Morris W. Offit ("Offit"), James F. Orr, III, Virigina M. Rometty, Michael H. Sutton ("Sutton"), Robert B. Willumstad and Frank G. Zarb.  The "Officer Defendants" are Sullivan, Tse, Win J. Neuger ("Neuger"), Frank G. Wisner ("Wisner"), Brian T. Schreiber ("Schreiber"), Steven J. Bensinger ("Bensinger"), Elias F. Habayeb, Robert E. Lewis, William N. Dooley and Frederick W. Geissinger.   The Outside Director Defendants (all directors except Tse and Sullivan), Director Defendants and Officer Defendants are collectively referred to as "Defendants."

[2] The term "Complaint" refers to the Verified Consolidated Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment and Violations of the Securities and Exchange Act of 1934, filed on February 15, 2008.  All paragraph references ("¶___" or "¶¶_____") are to the Complaint, unless otherwise noted.

[3] A credit default swap is a credit derivative in which one party makes periodic payment to a counter-party in exchange for the counter-party's promise to payoff third party debt obligations if the third party defaults.  Thus, a credit default swap is akin to an insurance policy.  They can be used by creditors to hedge against defaults on third party debt obligations.

[4] A CDO consists of a portfolio of credit-risky fixed-income assets, such as asset-backed securities and securitized mortgages.  A financial services company, such as AIG, creates a CDO by acquiring an inventory of asset-backed securities and then selling rights to the cash flows from the securities in a number of tranches rated by credit risk.  The bank then profits from the fees that it charges to manage the CDO.

2007. ¶¶82-83. AIG had previously claimed that the CDO's had declined in value by only $1.4 billion. ¶¶3, 79, 83. AIG's disclosures concerning its CDO's also cast doubt on AIG's past statements that the Company did not face any significant problems stemming from the ongoing mortgage crisis. The CDO disclosures also raised concerns that AIG would report further losses. PWC also found serious flaws in AIG's internal valuation methods, which the Company's executives outlined for investors to support their claims of financial soundness.

As a result, in part, of these disclosures, AIG's stock plunged nearly 12% to approximately $44 per share, closing on February 11, 2008 at its lowest price in five years. ¶¶83, 85. Furthermore, Fitch Ratings announced that it may lower AIG's AA credit rating because of AIG's "weakness in internal controls" coupled with "current market conditions, contributing to uncertainty regarding the valuation" of the Company's derivative portfolio. ¶84. The loss in the Company's stock price caused tremendous damage to members of the investing public. Defrauded investors filed securities class action claims against AIG on June 3, 2008. Further, the Starr Foundation, one of the largest AIG shareholders, brought an action for common law fraud against defendants Sullivan, Bensinger and the Company on May 7, 2008, based on false statements made by the Company concerning subprime exposure. Additionally, the Securities and Exchange Commission announced an investigation into the Company's credit swap portfolio on June 9, 2008. The recent developments indicate that the Company will continue to suffer damages due to the Defendants' actions.

In their motion to dismiss, the outside directors[5] urge this Court to dismiss the Complaint, claiming that: (i) the Complaint does not adequately allege a violation of §10(b) of the 1934 Securities Exchange Act ("§10(b)") because it fails to allege that AIG made false or misleading statements. *See* Memorandum of Law in Support of the Outside Directors' Motion to Dismiss ("Defs.' Mem.") at 6-9;[6] (ii) the Complaint does not adequately allege a 10(b) claim because it fails

---

[5] The Officer Defendants have joined in the Outside Directors' Motion to Dismiss without any additional argument. *See Memorandum of the Officer Defendants in Support of Their Motion to Dismiss the Complaint.* Therefore, Plaintiffs address both the Officer Defendants and Outside Directors motions through this Opposition.

[6] Nowhere in Defendants' motions to dismiss do the defendants allege that Plaintiffs have failed to plead reliance, causation or damages. Should the Court examine these elements, Plaintiffs have

to allege intent (Defs.' Mem. at 9-13); and (iii) the Complaint fails to state claims for breach of fiduciary duty, insider trading, waste and unjust enrichment (Defs.' Mem. at 13-18). Defendants' motion should be denied. As demonstrated below, Defendants are liable under §10(b) and breached their fiduciary duties to the Company and wasted corporate assets by issuing false and misleading statements concerning the Company's subprime exposure and hiding billions in losses while certain defendants sold over $6 million in personally held stock. Further, the Defendants breached their fiduciary obligations, wasted corporate assets and were unjustly enriched by approving a stock repurchase plan, despite the looming subprime meltdown and certain detrimental impact that it would have on the Company's share price.

For these reasons and the reasons discussed below, Defendants' motion to dismiss should be denied in its entirety.

## II.    STATEMENT OF FACTS

### A.    Defendants Deny AIG Had Any Exposure from Subprime Weaknesses

Since June 2006, the default rates for residential mortgages have been continuously escalating due in part to depreciating home pries and fluctuating interest rates. ¶¶50-51. Since that time, analysts and investors have questioned AIG's ability to maintain growth in its investment portfolios. Despite a falling market, Defendants issued statements that the Company was well positioned "'to quickly address changes in market conditions and client demand'" touting its "'diversified portfolio of market leading business that complement and balance each other.'" ¶¶69-70.

By March 2007, the subprime lending market had spiraled into a full-scale meltdown. Defendants, however, denied any potential decrease in growth or losses in investments from the degenerating subprime meltdown. Defendant Sullivan, the Company's Chief Executive Officer ("CEO"), said AIG felt "very comfortable with [their] exposure to the U.S. residential mortgage

---

adequately pled each. Plaintiffs have sufficiently pled reliance based on the Fraud-on-the-Market presumption. Plaintiffs allege loss causation by alleging the concealed subprime exposure and that, when the truth was revealed, there was foreseeable damage to the stock price. ¶84, 85, 88. Finally, Plaintiffs plead the Company suffered damages as a result of defendant Bensinger and the Director Defendants' actions. ¶¶1, 6, 88, 89, 90, 112, 120.

market, both in our operations and our investment activities." ¶¶75, 76. Furthermore, defendant Lewis stated that the "mortgage market would have to reach 'Depression proportions' before it negatively impacted AIG's portfolio." ¶77. Instead, Defendants claimed that the weakening subprime market created "a lot of opportunity" for the Company due to well-structured credit default swaps. ¶¶73, 76. While exalting the opportunities arising from the subprime crisis, however, several Defendants were selling their AIG stock. In total, defendants Cohen, Neuger, Schreiber and Wisner sold over $6 million in stock in a six month period between November 2006 and May 2007. ¶¶4, 44, 91, 102. In addition to denying AIG's subprime exposure, Defendants also claimed that they had improved the "financial control environment, providing greater transparency in our financial disclosures and remaining on the forefront of good corporate governance." ¶71. This statement was designed to reassure investors, who relied upon disclosures from Defendants to decipher the massive diversified Company's operations. ¶¶71-72, 75, 79.

In February 2007, the Director Defendants approved a plan for the Company to buy back up to $8 billion of its stock, signaling to the market that Defendants felt the Company's stock was undervalued. ¶¶64, 87, 96.[7] Under the Board of Directors' (the "Board") authorization, the Company has (thus far) bought back over $3.7 billion worth of the Company's own shares at an average price of approximately $67.89 per share. ¶96.

### B.    The Truth Slowly Emerges

Eventually, despite Defendants' statements to the contrary for over a year, on November 7, 2007, AIG reported a loss of $1.4 billion in AIG's investment portfolio, credit-swap portfolio and mortgage insurance business. ¶79. Even after this disclosure, Defendants still claimed that the Company would not suffer any additional losses. For instance, on December 5, 2007, defendant Sullivan said "AIG's credit portfolio was so sound that the chance of the Company's financial products unit sustaining economic losses was 'close to zero' and that AIG was 'confident in our marks and reasonableness of our valuation methods.'" ¶80.

---

[7] The background at to the market environment when the Board authorized the buyback is discussed more fully in Plaintiffs' Opposition to Motion to Dismiss by Nominal Defendant American International Group, Inc., Sections II.B. and C.

Soon thereafter, Defendants had more bad news.  On February 11, 2008 the Company disclosed that PWC found "faulty accounting may have understated the Company's losses on some holdings."  ¶83.  As a result, the Company's shares plummeted $5.94 or 11.7% to close at $44.74 on February 11, 2008, the lowest stock level in five years.  ¶84.  Further, the Company was required to lower the value of its credit derivative products by an estimated $4.88 billion rather than the $1.4 billion decline that Defendants had claimed in October 2007.  ¶85.

Despite the above potential exposure, all of the Director Defendants authorized a massive stock buyback of up to $8 billion of the Company's shares.  ¶87.  Under the Board's authorization, the Company has (thus far) bought back over $3.7 billion worth of the Company's own shares at an average price of approximately $67.89 per share.  *Id*.  The Company's stock is currently trading for approximately $33 per share – or one-half of what the Company paid for its own shares pursuant to the buyback plan approved by Defendants.  As a result of Defendants' actions, AIG's market capitalization and reputation continues to suffer.  ¶90.  To date, additional information concerning losses and wrongdoing continues to emerge.[8]

## III.    PLEADING STANDARDS

### A.    Legal Standard for Motion to Dismiss

A motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)") will only be granted if, based solely on the pleadings, it appears ***beyond doubt*** that the plaintiff can ***prove no set of facts*** in support of his claim which would entitle him to relief.  *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).  In deciding a motion to dismiss, all well-pleaded allegations of the complaint must be taken as true and interpreted in the light most favorable to the plaintiff, and all inferences must be drawn in favor of them.  *See IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1052 (2d Cir. 1993); *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir. 1984).  A

---

[8]  For example, on June 8, 2008, the Securities and Exchange Commission ("SEC") disclosed an investigation into the Company's credit default swap portfolio.  *See* Form 8-K filed with SEC on June 8, 2008.

complaint can only be dismissed if "it appears to a certainty" that no relief could be granted under any set of facts which could be proved. *Id.*

Consequently, a complaint will not be dismissed pursuant to Rule 12(b)(6) unless no law supports the claim made, the facts alleged are insufficient to state a claim or an insurmountable bar appears on the face of the complaint. The standard to be applied by a court in ruling upon a motion to dismiss places a heavy burden on the moving party in light of the liberal pleading standards of the Federal Rules of Civil Procedure. In this case, the Complaint satisfies these standards and sets forth many claims upon which relief can be granted.

**B.    Notice Pleading Applies to Plaintiffs State Law Claims**

Counts III through VI in the Complaint are fiduciary duty claims, not fraud claims. Accordingly, the adequacy of the Complaint with respect to stating fiduciary duty claims should be measured by Rule 8 of the Federal Rules of Civil Procedure ("Rule 8"). Defendants argue that Plaintiffs must satisfy the pleading requirements of Rule 9(b) because Plaintiffs' allegations of false and misleading statements sound in fraud. Defs.' Mem. at 9. Defendants, however, overlook the distinction between 10(b) claims and fiduciary duty claims.

Notice pleading standards, not the heightened standards of Rule 9 of the Federal Rules of Civil Procedure ("Rule 9"), apply to Plaintiffs' breach of fiduciary duty, unjust enrichment and waste claims. *See Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 00 Civ. 8688 (WHP), 2002 WL 362794, at *8 (S.D.N.Y. Mar. 6, 2002); *Schupak v. Florescue*, No. 92 Civ. 1189 (JFK), 1993 WL 256572, at *3 (S.D.N.Y. July 8, 1993).[9] Under the requirements of Rule 8, the complaint should provide *a short and plain statement of the claim* through simple,

---

[9] *See also Sheldon v. Vermonty*, 31 F. Supp. 2d 1287, 1295 (D. Kan. 1998) (Generally, "a plaintiff pleading a claim for breach of fiduciary duty need only comply with Rule 8 ..., not Rule 9(b), because th[e] claim is not based on fraud."); *Kaiser v. Stewart*, No. 96-6643, 1997 WL 476455, at *15-*16 (E.D. Pa. Aug. 19, 1997) (Rule 9(b) is inapplicable to fiduciary duty claim applying only to claims sounding in fraud.); *U. S. v. Kearns*, 595 F.2d 729, 733 n.18 (D.C. Cir. 1978) (sufficiency of fiduciary duty claims is subject to Rule 8 and not Rule 9(b)); *Tri-Med Fin. Co. v. Nat'l Century Fin. Enter., Inc.*, No. 98-3617, 2000 WL 282445, at *5-*7 (6th Cir. Mar. 6, 2000) (not applying Rule 9(b) to breach of fiduciary duty claim and noting that 9(b) "must be read in conjunction with Rule 8, which calls for short, concise statements"). These cases demonstrate that Rule 9(b) does not apply to breach of fiduciary duty claims like those brought here.

concise and direct allegations. *Michaels Bldg. Co. v. Ameritrust Co.*, *N.A.*, 848 F.2d 674, 679 (6th Cir. 1988). The Complaint need only give the opponent *fair notice of the claims and the grounds upon which it rests*. *See In re Tower Air, Inc.*, 416 F.3d 229, 237 (3d Cir. 2005); *Mickowski v. Visi-Trak Worldwide, LLC*, 298 F. Supp. 2d 692, 694 (N.D. Ohio 2003). As discussed below, Plaintiffs have done so and have met the pleading requirements of Rule 8. Plaintiffs claims should be sustained.

While Plaintiffs allege that Defendants disseminated false and misleading financial statements and press releases, Plaintiffs need not show that Defendants intended to defraud AIG in order to establish liability for breach of fiduciary duty, waste or unjust enrichment. *See Official Comm. of Unsecured Creditors*, 2002 WL 362794, at *8.

Counts I and II comprise Plaintiffs §10(b) and §20(a) of the Securities Exchange Act of 1934 ("§20(a)") claims. Rule 9 applies to theses claims and requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," an exception to the generally liberal scope of pleadings allowed by Rule 8. *See Ross v. A.H. Robins Co.*, 607 F.2d 545, 557 (2d Cir. 1979);[10] *Luce v. Edelstein*, 802 F.2d 49 (2d Cir. 1986). This is true in derivative actions where violations of §10(b) or Rule 10b-5 are pled. *In re Countrywide Fin. Corp. Derivative Litig.*, No. CV-07-06923-MRP, 2008 WL 2064977, at *1(C.D. Cal. May 14, 2008). "Where individual defendants are 'insiders or affiliates' of the corporation in question, no specific connection between those individuals and a misrepresentation made in a public document such as an offering memorandum or quarterly report is necessary. " *Brickman v. Tyco Toys, Inc.*, 722 F. Supp. 1054, 1061 (S.D.N.Y. 1989). Where defendants are outsiders, plaintiffs satisfy their pleading requirements by tying the outside defendants to the statements in question. *Id.*

## IV.    THE COMPLAINT STATES A CLAIM UNDER SECTION 10(b)

A complaint states a claim under §10(b) of the Exchange Act where it alleges "the defendant,

---

[10] Here, as throughout, all emphasis is deemed added and all citations are deemed omitted unless otherwise noted.

in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161 (2d Cir. 2000). Plaintiffs have alleged that defendant Bensinger and the Director Defendants[11] made materially misleading statements. As demonstrated in detail below, Defendants have not been truthful about AIG's exposure to the subprime market, ¶¶79-85, made false or misleading reassuring statements about AIG, ¶¶65-78, and did not make corrections to their false and misleading statements regarding AIG's exposure to the subprime market, ¶¶88-90. Plaintiffs also alleged that Defendants made false and misleading statements with scienter by pleading with particularity that certain defendants had motive and opportunity and the Defendants acted recklessly or were conscious of their misconduct. Thus, as more fully explained below, Phave pled a cause of action for violation of §10(b) with the particularity necessary to state a claim against the 10(b) Defendants.

### A.    The Complaint Pleads Material False and Misleading Statements with Particularity

Throughout the relevant period, the Defendants made materially false and misleading statements about AIG's business prospects and exposure to the subprime market. Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a complaint sufficiently alleges false or misleading statements by "specifiy[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B). A fact or omission is material if there is a "substantial likelihood" that "'the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Basic, Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988).

Here, the Complaint identifies Defendants' false and misleading statements and omissions, explains why each was false, and pleads particularized facts supporting the allegations. ¶¶65-78, 86, 92-106. First, Plaintiffs allege that Defendants made false statements concerning the Company's

---

[11] Plaintiffs' references to "Defendants" or "10(b) Defendants" in Section III of this opposition refer only to defendants against whom Plaintiffs bring claims for violations of securities law, defendant Bensinger and the Director Defendants.

subprime exposure.  On May 11, 2007, the defendant Neuger made false or misleading statements when he claimed there was "a lot of opportunity" for AIG in the weakening subprime market.  ¶73. Defendant Sullivan said AIG felt "very comfortable with [their] exposure to the U.S. residential mortgage market, both in our operations and our investment activities."  ¶¶75, 76.  Defendant Lewis made false or misleading statements when he claimed the "mortgage market would have to reach 'Depression proportions' before it negatively impacted AIG's portfolio."  ¶77.  Furthermore, defendant Sullivan said market turmoil was the reason for certain securities problems and that it was "unrelated to the fundamental financial characteristics" of the Company.  ¶77.  Plaintiffs allege it was not market turmoil, however, but fundamental financial problems with AIG that were the cause of AIG's financial turbulence, causing significant losses to the Company.  ¶79.

Second, Plaintiffs allege that Defendants issued misleading statements falsely reassuring the market that AIG's credit portfolio was not impacted by the market downturn.  On December 5, 2007, Sullivan said "AIG's credit portfolio was so sound that the chance of the Company's financial products unit sustaining economic losses was "close to zero" and that AIG was 'confident in our marks and reasonableness of our valuation methods.'"  ¶80.  Furthermore, Sullivan stated "we have a... high degree of certainty in what we have booked to date."  ¶80.  Plaintiffs allege that, upon this reassuring news, AIG share prices jumped $2.70 (roughly 5.0%) to close at $58.15.  ¶82.

Defendants argue that Plaintiffs only pled that post-November 2007 statements "cast doubt" on the propriety of pre-November statements.  Defs.' Mem. at 8.  Defendants, however, ignore Plaintiffs' allegations concerning the February 2008 disclosures.   Plaintiffs have pled that the Company's auditor, PWC, found "faulty accounting may have understated the Company's losses on some holdings" just two months after Defendants announced that AIG's credit portfolio had a "close to zero" chance of sustaining losses.  ¶83.  Further, Plaintiffs plead that the Company was required to lower the value of insurance contracts by an estimated $4.88 billion in February 2008 (rather than the $1.4 billion the company claimed in October, November and December).  ¶85.  The February 2008 announcement did not merely "cast doubt" on pre-November statements.  It declared, in no uncertain terms, that the pre-November 2007 statements were false or made with reckless disregard

for the truth. Thus, Plaintiffs' allegations rise well above the level necessary to demonstrate false and misleading statements were made by Defendants.

As the subprime market degenerated, Defendants continued to deny AIG's subprime exposure, despite evidence to the contrary. ¶78. Defendants also made statements designed to deliberately hide flaws in the true value of the Company's derivative insurance contracts. *Id.* Thus, Plaintiffs have adequately alleged that Defendants made false and misleading statements.

### B.    The Complaint Advances A Strong and Compelling Inference of Scienter

The PSLRA "requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504 (2007).

To qualify as "strong" within the intendment of §21D(b)(2), an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. *Id.* at 2504-05. Scienter can be established by either showing a person made a knowing false or misleading representation or was reckless in doing so. *In re Ames Dep't Stores, Inc. Stock Litig.*, 991 F.2d 953, 965 (2d Cir. 1993). An inference of scienter is established by alleging either: (i) facts that defendants had motive and opportunity; or (ii) facts that create circumstantial evidence of conscious misbehavior or recklessness. *Ganino*, 228 F.3d at 168-69. Although speculation and conclusory allegations do not suffice, plaintiffs are not required to plead "great specificity," provided the alleged facts support "'a strong inference of fraudulent intent.'" *Id.* at 169. The Court should review the Complaint as a whole, *Tellabs*, 127 S. Ct. at 2509, not in isolation as Defendants urge. Defs.' Mem. at 12-13. In *Tellabs*, the Supreme Court clarified scienter pleading requirements under the PSLRA and held courts must determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* (emphasis in original).

The required state of mind is satisfied where, as here, the complaint alleges that defendants acted either knowingly or with deliberate recklessness as to the truth of their statements. *See*, *e.g.*, *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004). The preceding section detailed Defendants' false and misleading statements and omissions during the

- 10 -

relevant period.  Importantly, the same basic facts that allege falsity may also allege scienter.  *See In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613 (S.D.N.Y. 2003).  Plaintiffs have pled Defendants recklessly made baseless statements of reassurance and /or ignored numerous red flags, engaged in insider trading and wasted corporate assets.  ¶¶2, 4, 68-82, 87, 91, 96, 97.  These allegations, taken together, create a compelling and cogent inference of scienter against Defendants.

### 1. Defendants Recklessly Authorized the Stock Repurchase and Made False and Misleading Statements While in Possession of Knowledge Contradicting Their Public Statements

A strong inference of scienter exists where there are allegations that defendants "knew facts or had access to information suggesting that [the Company's] public statements were not accurate." *Novak v. Kaskas*, 216 F.3d 300, 311 (2d Cir. 2000).  Thus, "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Id*. at 308.  Furthermore, conscious misbehavior or recklessness can be satisfied by "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000).  "'Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.'" *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).

Defendants act recklessly if they make baseless affirmative statements to reassure the marketplace. *Novak*, 216 F.3d at 311-13.  In *Novak*, plaintiffs alleged that defendants had made or caused to be made a series of positive statements to the public about the status of Ann Taylor's inventories, describing them at various points as "under control," "in good shape," and at "reasonable" or "expected" levels; stating that "no major or unusual markdowns were anticipated"; and attributing rising levels of inventory to growth, expansion, and planned future sales, despite knowledge otherwise. *Id*. at 304.  Thus, the AnnTaylor defendants' alleged deception painted too rosy a picture of the Company's current performance and future prospects and kept the company's

stock price at an artificially high level during the Class Period. *Id*. Ultimately, the defendants were forced to report significantly lower earnings. *Id*. The appeals court found that these allegations demonstrated scienter because "when managers deliberately make materially false statements … with the intent to deceive the investment community, they have engaged in conduct actionable under the securities laws." *Id*. at 312.

Defendants claim that Plaintiffs cannot demonstrate scienter because Plaintiffs do not allege that they read subprime market media reports. Defs.' Mem. at 9. This misses the point. As in *Novak*, Plaintiffs have pled specific false statements made by certain insiders. Like in *Novak*, defendant Sullivan made deliberately false comments in an attempt to reassure investors that AIG was not at risk from the subprime crisis. Defendant Sullivan stated that the chances of the Company's financial products sustaining losses was "close to zero" at an investors meeting in December. This statement, made one month ***after*** the Company announced that it had $1.4 billion in portfolio losses, was wildly inaccurate, as in *Novak*. ¶73. As the $4.8 billion additional loss was announced just two months later, defendant Sullivan could not have had any reasonable basis for this statement, supporting an inference of fraudulent intent. Further, the Director Defendants had no reasonable basis to allow such statements to be made and to not correct them. Similarly, on a conference call in August 2007, defendant Sullivan stated that the subprime market crisis was "an opportunity" for the Company. ¶76. Defendant Sullivan's statement obviously was intended to convey that AIG would profit from the subprime market crisis. The truth was the opposite. Again, this reckless statement gives rise to an inference of fraudulent intent. In light of the developments in regard to the subprime market at AIG, the exposure did not create "a lot of opportunity" nor was the risk of losses "close to zero."[12]

Plaintiffs also allege that, in light of their positions on a large financial institution's Board and the positive statements Defendants were making, Defendants were reckless in not knowing

---

[12] Defendants also made other statements designed to reassure the marketplace during the meltdown. For example, they touted their "improved" financial control environment, claiming that they were "providing greater transparency in [the Company's] financial disclosures and remaining on the forefront of good corporate governance." ¶71. This false statement was designed to inspire confidence in the Company and appease investors concerns of complicated financial statements. *Id*.

about AIG's subprime exposure issues. Notably, Defendants fail to address their reckless behavior in ignoring extensive subprime coverage. Here, Defendants abrupt multi billion about-face punctuates their disregard for the truth. They all along had access to facts clearly indicating that their rosy public statements were false. Defendants repeatedly represented to the public that the Company's credit derivative portfolios, including CDOs and credit default swaps, would not lose any value due to subprime exposure. ¶¶80-84. If, in fact, Defendants did not have actual knowledge that these statements were false, Plaintiffs have sufficiently alleged they were reckless in not knowing it. ¶¶64, 67, 86. The Company has extensive involvement in the subprime market through various credit derivative products, including CDOs and credit default swaps. ¶¶63, 81-84. During the time Defendants made their false statements, there was wide spread news coverage of public companies exposed to the market. ¶¶64, 49-63. Further, the Audit Committee directors, defendants Miles, Offit and Sutton, had to duty to review financial statements and press releases. ¶¶66, 97. It is the special province of the Audit Committee to know, understand and discuss earnings press releases and financial information released to analysts and rating agencies. *Id.* However, the Audit Committee participated in and failed to correct the false and misleading press releases and financial information. *Id.* Thus, defendants Miles, Offit and Sutton were reckless in allowing press release after press release to be issued that did not accurately reflect the Company's exposure to the subprime market. *Id.*

Finally, Defendants reinforced the rosy picture they were trying to paint by initiating a buyback of the Company's stock in February 2007. At the time, Defendants were on notice of AIG's subprime exposure through the Company's mortgage backed securities, mortgage-insurance business and mortgage lending segment. ¶¶4, 87, 89, 96. By making repeated positive statements to reassure the marketplace and approving a stock repurchase plan the same month that the subprime crisis degenerated into a full blown meltdown, Defendants conduct was "highly unreasonable" to the extent that the subprime exposure was either known to Defendants or so obvious that the Defendants must have been aware of it. *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir.1996) ("'An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an

inference of … recklessness.'").  Thus, the allegations regarding Defendants' conscious misbehavior and reckless conduct establishes a strong, cogent and compelling, inference of scienter.

### 2. The Complaint Adequately Alleges Scienter Against Defendants Sullivan, Tse and Bensinger

Plaintiffs plead defendants Sullivan, Tse and Bensinger further had the requisite scienter because they had motive and opportunity to benefit from their misconduct.  *Novak*, 216 F.3d at 307.  Motive is demonstrated by pleading allegations that "would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."  *Id.*  Opportunity is shown by demonstrating "the means and likely prospect of achieving concrete benefits by the means alleged."  *Id.*  While keeping the stock price high alone does not alone establish scienter, courts must inquire into "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets the standard." *Tellabs*, 127 S. Ct. at 2509 (emphasis in original).

Defendants Sullivan, Tse and Bensinger had financial and personal motive to conceal material facts concerning the Company's true financial prospects.  These defendants deliberately misrepresented the Company's business prospects.  ¶¶44, 65-78.  By doing so, these defendants were able to enhance their executive positions, increase the power and prestige they enjoyed as a result of their positions, and conceal their mismanagement of AIG's operations.  ¶¶44, 91.  Executives' salaries are a way for companies to put the executives' interests in line with shareholders so the executives maximize shareholder value.  These three defendants in this action had motive to keep the stock price high and mislead investors in order to maximize their personal compensation.  ¶¶12-14.  Defendants Sullivan, Tse and Bensinger's additional motive included concealing their violations of federal securities law, breaches of fiduciary duty, waste of corporate assets and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition and future business prospects.  ¶46.  Again, while these motives alone do not demonstrate scienter, when taken in conjunction with these defendants' false and misleading statements, a strong inference of scienter arises.

Defendants Sullivan, Tse and Bensinger had significant opportunity to issue false and misleading statements in order to effectuate their motive.  Plaintiffs have particularly alleged multiple false and misleading statements issued by defendant Sullivan, including that subprime exposure was "close to zero" and that subprime market crisis was "an opportunity" for the Company. ¶80.  Defendant Sullivan, the Company's CEO, and defendant Bensinger, the Company's Chief Financial Officer, participated in virtually all investors meetings and analyst conference calls and reviewed and approved the Company's public statements.  ¶¶12, 17, 107-12.  Thus, defendants Sullivan, Tse and Bensinger had opportunity to issue false and misleading statements, artificially inflating the Company's stock price and maximizing their personal compensation.

Again, Defendants have not pointed to any "competing inferences rationally drawn from the facts alleged."  *Tellabs*, 127 S. Ct. at 2504.  Through the above allegations, the Complaint has alleged enough facts to support a "'strong inference of fraudulent intent.'"  *Ganino*, 228 F.3d at 169. The entirety of the particularized facts alleged would lead a reasonable person to believe that a strong inference of scienter has been alleged in the Complaint against defendants Sullivan, Tse and Bensinger.

### C.    The Complaint Pleads Control Liability Against Defendants Sullivan, Miles, Offit and Sutton For Violation of §20a

A complaint sufficiently states a claim for control person liability under §20(a) if it alleges: (1) a primary violation of the securities laws; and (2) that a defendant possessed power or control that directly or indirectly induced a violation of securities law.  *No. 84 Employer-Teamster Joint Council Pension Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003).  Defendants claim that Plaintiffs cannot demonstrate a §20(a) claim because they have failed to plead a securities law violation.  However, as demonstrated above, the Complaint pleads the requisite elements for a primary violation of federal securities law.  *See*, *supra*, at 7-14.

As to the second element of a §20(a) claim, the SEC has defined "control" to include "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies or a person, whether through ownership of voting securites, by contract or otherwise."  17 C.F.R. §230.405.  *See also S.E.C. v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2nd Cir. 1996).

- 15 -

The Complaint adequately alleges facts demonstrating that defendants Sullivan, Miles, Offit and Sutton were controlling persons vested with the "power to direct" the "management and policies" of AIG during the relevant period.  Specifically, the Complaint alleges that: (i) all four defendants exercised authority over AIG's SEC filings and press releases, ¶104; (ii) defendant Sullivan participated in conference calls with investors, ¶76; (iii) defendant Sullivan directed the operations of AIG, ¶12; and (iv) all four defendants occupied positions of control on AIG's Board, ¶96.  As such, the Complaint adequately pleads the necessary elements to demonstrate control person liability under §20(a).

## V.    THE COMPLAINT STATES A CLAIM FOR THE REMAINING STATE LAW CAUSES OF ACTION

### A.    The Complaint States a Claim for Breach of Fiduciary Duty

Officers and directors of a corporation owe a fiduciary obligation to the company and its stockholders.  *See Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 386 (Del. Ch. 1999).  Under Delaware law, a "'sustained or systematic failure of the board to exercise oversight … will establish the lack of good faith that is a necessary condition to … liability.'"  *In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795, 808 (7th Cir. 2003).  Indeed, it is a failure to act in good faith when a director consciously disregards a known duty. *See In re Walt Disney Co. Derivative Litig.,* 906 A.2d 27 (Del. 2006).  *See also Stone ex. rel. AmSouth Bancorporation v. Ritter*, No. 93, 2006, 2006 WL 3169168, at *5 (Del. Nov. 6, 2006) (under Delaware law, a failure to act in good faith may be shown "'where the fiduciary *intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties*'") (quoting *Walt Disney*, 906 A.2d 27 at 67).  Thus, officers and directors of a corporation face liability where plaintiffs allege facts demonstrating that the directors consciously disregarded their fiduciary obligations to the company.

Here, the Complaint pleads that Defendants knew or were reckless in not knowing that the Company's investment portfolios were exposed to potential losses from the subprime crisis.  ¶64.  Defendants attempt to characterize Plaintiffs' fiduciary duty claim as an "oversight" claim.  This is incorrect.  Plaintiffs have pled that directors have consciously disregarded their known duties.  ¶¶41, 88.  Plaintiffs also plead that Defendants issued rosy press release after rosy press release with

reckless disregard for the truth about AIG's true subprime exposure. *See* Section III.B. Defendants Sullivan, Miles, Offit and Sutton, as the CEO and members of the Board's Audit Committee, also signed off on false and misleading financial statements, in violation of their fiduciary obligations to both the Company and shareholders. ¶66. To compound matters, defendants Cohen, Neuger, Schreiber and Wisner sold over $6 million in stock during the period that Defendants were releasing false and misleading statements concerning AIG's financial position. ¶91. Finally, the Director Defendants authorized the repurchase of AIG shares, while the subprime meltdown was costing the Company undisclosed billions of dollars.

Defendants assert that the breach of fiduciary duty claims here merely amount to a failure of oversight without any showing of bad faith or personal benefit. Defs.' Mem. at 14. Plaintiffs demonstrate in the Opposition to Nominal Defendant AIG's Motion to Dismiss for Demand Futility why these arguments lack merit and why Defendants are liable for breaches of their fiduciary duties. As explained there in more detail, Defendants' actions in this case were even worse than consciously disregarding a known duty or "intentionally fail[ing] to act in the face of a known duty to act." *Id*. As Plaintiffs have demonstrated above, Defendants issued reckless rosy statement after reckless rosy statement to reassure the market of AIG's financial condition when, in fact, the bases for these reassuring remarks were non-existent. Defendants also approved a stock repurchase plan, spending $3.7 billion on repurchasing artificially inflated AIG stock. ¶96. Defendants actions, taken together, create the reasonable inference that Defendants breached their duties of good faith, care and loyalty. In light of the above, Plaintiffs have adequately pled their claim for breach of fiduciary duty.

### B.    The Complaint Pleads Facts to Demonstrate Unjust Enrichment Against All Defendants

The elements of unjust enrichment are: (1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and impoverishment; (4) the absence of justification; and (5) the absence of a remedy at law. *Jackson Nat'l Life Ins.*, 741 A.2d at 393. *See also Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999) (unjust enrichment is defined as """the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience""").

Defendants claim that Plaintiffs have not alleged any wrongful acts. Defs.' Mem. at 18. Plaintiffs' claim for unjust enrichment is plain on the face of the Complaint. The Officer Defendants were unjustly enriched by receiving substantial compensation from AIG based upon inaccurate financials based on inadequate valuation methods in certain investment portfolios. ¶¶12-14, 17. Further, the Insider Selling defendants were unjustly enriched through selling their stock at artificially inflated prices while knowing of the true precarious nature of AIG's investment portfolios. Accordingly, Plaintiffs have adequately alleged a claim for unjust enrichment against all Defendants.

### C.    The Complaint Demonstrates that All Defendants Wasted Corporate Assets

The essence of a claim of waste of corporate assets is the diversion of corporate assets for improper or unnecessary purposes. *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979). Corporate waste "entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000). Most often the claim is based on a transfer of corporate assets that serves no purpose for the corporation or for which no consideration is received. *Id.* Defendants again claim that Plaintiffs have not stated a claim for waste because they have not adequately alleged a false or misleading statement. But this is wrong.

Here, Plaintiffs allege that, based upon the factual allegations in the Complaint and detailed above, Defendants caused AIG to waste valuable corporate assets by paying billions of dollars to buyback stock at artificially inflated prices. ¶¶64, 87. Plaintiffs further allege that Defendants caused AIG to waste corporate assets by approving the stock buyback program while in possession of knowledge of the impact of the subprime meltdown, CDO valuation issues and massive losses on the Company's future. ¶¶80-85, 87. Also, Defendants wasted assets through incentive-based bonuses to certain executives and causing AIG to incur potentially millions of dollars in legal liability and/or legal costs to defend Defendants' unlawful actions. ¶128.

In light of the above, Plaintiffs have stated a cause of action for unjust enrichment and waste, thus the Officer Defendants and the Outside Directors' motions to dismiss should be denied.

## VI.    IF THE MOTION TO DISMISS IS GRANTED, PLAINTIFFS SHOULD BE GRANTED LEAVE TO REPLEAD

Should the Court grant Defendants' Motion to Dismiss any of Plaintiffs' claims, Plaintiffs respectfully request leave to replead.  Rule 15(a) of the Federal Rules of Civil Procedure expressly provides that a party may amend by leave of court and that "leave to amend 'shall be freely given when justice so requires.'"  *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

In addition, the Second Circuit has frequently found that leave to amend should be granted in complex actions.  *See, e.g., Ronzani v. Sanofi, S.A.*, 899 F.2d 195, 198 (2d Cir. 1990); *Luce*, 802 F.2d at 56.  Moreover, the Federal Rules of Civil Procedure support a liberal amendment policy and a motion for leave to amend should not be denied unless there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed [or] undue prejudice to the opposing party by virtue of allowance of the amendment." *Foman*, 371 U.S. at 182.

None of those infirmities exist here.  Plaintiffs' have not previously amended their allegations as to any of the Defendants.  Moreover, granting Plaintiffs leave to amend in this case would not be dilatory.  Instead, it would permit Plaintiffs the opportunity to plead more recent facts that further demonstrate the reasons why the rosy outlook Defendants painted during the subprime meltdown was false and/or reckless.

## VII.    CONCLUSION

In light of the foregoing, the Officer and Outside Director defendants' motion to dismiss should be denied.

DATED:  June 16, 2008                                  Respectfully submitted,

                                                                   LAW OFFICES OF THOMAS G. AMON
                                                                   THOMAS G. AMON


                                                                   _____
                                                                           s/Thomas G. Amon
                                                                   THOMAS G. AMON (TGA-1515)

250 West 57th Street, Suite 1316
New York, N.Y. 10107
Telephone: (212) 810-2431
Facsimile:  (212) 810-2427

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
JEFFREY P. FINK
FELIPE J. ARROYO
JULIA M. WILLIAMS
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991

Co-Lead Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2008, the foregoing document was filed with the Clerk of the Court for the U.S. District Court, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this Notice as service of documents by electronic means. I hereby certify that I have served the foregoing document to all individuals who have not consented to electronic notification by mail.

s/Thomas G. Amon
THOMAS G. AMON

343866_9.DOC